Good morning ladies and gentlemen. This is the time for hearing I think in the case of Singh Barapind v. Enomoto et al. And each side has a total of 30 minutes. The appellate may proceed. Good morning. Jagdeep Sikha on behalf of Kulveer Singh Barapind. May it please the court. In this remarkable case, Mr. Barapind seeks a rather unremarkable application of legal principles. Application of rudimentary legal principles in this case will entitle Mr. Barapind to a finding that the Indian government's evidence was inherently unreliable and could not establish probable cause given the totality of the circumstances of this case. Secondly, a straightforward application of the political offense exception that Mr. Barapind is entitled to under article 6 of the treaty would require that this court reverse the lower court's ruling that Mr. Barapind was extraditable under the governing 1931 treaty. I would like to at this time take some time to distill the evidence in this case, which is hard to comprehend not because of its weight, but because of the Indian government's actions. The initial extradition request was submitted in June of 1994, although the complaint was not filed until 1997. In that request, there is an affidavit by Punjab police officer Satish Kumar Sharma. That affidavit rests on affidavits that police officers secured from alleged eyewitnesses. In each of the 11 cases, there is one affidavit. Each case rests on one affidavit. These documents, although presented as affidavits, do not have a signature, are not dated, and there is no explanation as to why they aren't signed or not dated in the 1994 submission. Apparently, it appears that there was some sort of advance by the United States government where they requested the Indian government to explain what this evidence was, which in fact is what should be done when one cannot comprehend evidence, ask for an explanation. The Indian government turns around and recharacterizes the evidence. They don't call them affidavits anymore. They said these documents are statements that were either secured by a police officer from his or her police log, or they were statements given in court. Counsel, if this proceeding is akin to a preliminary examination in federal court, don't our magistrates routinely rely upon hearsay evidence which may be contained in the reports of investigating case agents as to what witnesses told them or what was observed in the formulation of probable cause to arrest the defendant? Yes, Your Honor. And absolutely, these proceedings are akin to what a federal magistrate would do at a probable cause hearing. And that is what's key to the case here. If in the United States, a police officer showed up with a typed piece of paper, called it an affidavit that was not signed, that was not dated, that was given by someone who did not speak that language, the magistrate would most likely ask, well, where's the translation or where's the original? Isn't it well established that you can get an indictment from a grand jury on nothing but a policeman saying witnesses told me this and that? Yes, Your Honor. That is established. But that's not what happened here. Here we have... Good enough. Why wouldn't this be good enough? Because... They're both just attempts to establish probable cause. Because, Your Honor, here we actually have the proof, the evidence that was submitted. And I do also want to add, Your Honor, we have a larger context. The larger context in this case is that it is, as the hearings proceed, it's evidenced that these kind of statements are wholly unreliable. In other words, it would not only be like a police officer showing up presenting something as an affidavit, that police officer would have had a history of torturing people, coercing statements from eyewitnesses, and then, in some cases, having had killed eyewitnesses to events. Why isn't this something that Mr. Barak can raise during his trial in India? The Indian courts allow him to present that as a defense. If any of the evidence is tainted or falsified or contradicted or anything of that sort, the Indian courts can and will resolve it, no? Well, Your Honor, that is not something that this Court is to inquire into, what the Indian courts will or will not do. That... If we look into questions of probable cause, as Justice Planoff's question suggests to you, the grand jury doesn't look at the minutiae of the evidence. It decides, is a probable cause, is it enough there for a court to have a trial and decide whether the evidence supports a conviction? That's all a grand jury does. And by analogy, that's really all we can do, find whether it's a, there's enough evidence there where a properly constituted court could sift through it and decide one way or the other. Isn't there enough here for that? And questions like the one you raised, which are very good questions, would then have to be resolved by the courts of the jurisdiction where the trial occurs. Your Honor, if I may, with respect to your, when I went to answer the first part, when I understood your question to be earlier, is that we don't inquire into what the government, the courts of India will or will not do. But Your Honor is correct, and the determination is whether the evidence establishes probable cause. But the probable cause standard is our standard, the United States standard, and that's established by Article 9 of the treaty. And it's traditionally what is the standard in every case. So the issue before this Court... It does not have to be proof that's admissible in court necessarily. It could be evidence that would be suppressible if you ever go to trial. It could be proof where we would look at it and say, gee, that's pretty flimsy. Yeah, maybe there's something there, but certainly not enough to convict. Absolutely. That would all be enough to bind somebody over for a trial. Absolutely, Your Honor. And the point of this case is how low is that standard? Is that standard, as the First Circuit described, toothless or not? And the First Circuit explained that that standard is not completely toothless. If this evidence was to survive a probable cause analysis, a government could just step in, send in a typed piece of paper with no signature, change its explanations, even if it's later proved that these types of evidence against this specific relator... You actually got a judge who very carefully assessed this evidence, looked at some of the charges and accepted some, rejected others. I mean, really a... I mean, I know you don't agree with everything the judge said, but really it was a very thorough, professional, thoughtful job. So this was not a rubber stamp. This was not where, you know, you give us a piece of paper, anything, and we'll send you the guy. This was a judicial officer exercising judgment discussion. Your Honor, I wholly agree with your analysis of Judge Wenger's effort in the case. Judge Wenger did an outstanding job of letting both sides present their case. I think he would not want to be called toothless. But the district court, but it is also our system that we have trial courts and we have appellate courts. And the fact that a lower court judge may have erred does not insult his work, does not mean that their work was not good. So this is just how our system is designed to prevent legal errors. And, Your Honor, I submit that it was legal error to find that the Indian government's evidence was reliable. You can't recharacterize your evidence, then say that there's a certificate of translation. It doesn't exist. At that point, you're starting to wonder, does this evidence exist or not? The Indian government says it's available in its district courts. And instead of going to the district courts to actually get evidence, which all they had to do was go there and run copies of evidence that they appear to have, they present another round of evidence that just makes you prove that the original evidence was not there. But even if the extradition is initially refused and a magistrate will not certify, there is no limit on the number of times that the government can come back and seek extradition on the basis of stronger evidence. We see it all the time. Absolutely, Your Honor, that may be the Indian government's safeguard, that they can, if they need to, if they have evidence, they can submit more evidence. They've had seven years, Your Honor, to do that. For the purpose of my question, I'd like you to assume that probable cause is established and that the evidence is sufficient to do that. And I know, obviously, that you don't agree with that, but it's the premise of my question. If that is the case, what test should we apply for the political offense exception? Clearly, there are some things like treason or assassination that are clearly within that exception and some things that are clearly outside. But for what's the test for the things that arguably are in the middle that you think this Court should adopt? Yes, Your Honor. I think we have the pure political offense that Your Honor referenced, and I think what are called the relative political offenses. And I believe that we should apply the same test that's been applied by every court with some variation, but every court has addressed the issue, and that's the American incidence test. And I think that that is the applicable test. It was set forth by the Supreme Court, and the four factors set forth by the Supreme Court and Ornelas, I believe, are effective ways to determine whether or not an offense is incidental to the uprising that we have in the case. Could you apply that test to the one case which I think is your hardest, and that is the murder of the wife of one of the alleged police informants or sympathizers in her bedroom when her home was invaded, allegedly by Mr. Berrapind and others? Yes, Your Honor, and that is our hardest case, and I believe the application of the four factors warrant that the offense be deemed political. Explain how in the context of the facts surrounding her death. Yes, Your Honor. Well, the first factor is the motive of the attack, and I won't spend too much time on that, because I think essentially the evidence establishes that there were Sikh militants who went to the home of government counterinsurgents in the midst of this political uprising. But I think the factor that I now believe is the factor that needs a little bit of exploration is the character of the foreign. In this case, what we have is the government counterinsurgents, they're not in barracks, they're not somewhere else outside of their home, they're actually in their village, and they're in their home, and their parents are in that home and the wife of one of the government counterinsurgents is in that home. And so the character of the foreign in the midst of this political context was one that put Ms. Kaur at risk that was just simply a fact of the way that this political uprising unfolded. So she's just unfortunate collateral damage to an otherwise legitimate attack in the nighttime on where the enemy happens to be bedding down? Well, Your Honor, I hope I don't want to call it collateral damage, Your Honor, but I do think that in the context of this case, you have to look at the character of the foreign and then also look at the nature of the victims who were targeted or the object of the operation. That cuts the other way, because they obviously did not try to and did not kill the parents. Yes, Your Honor, exactly. And I think the actions that issue here is the alleged actions of the relator. And if we examine the alleged actions of the relator, he did not, he's not even alleged to have harmed any civilian and he wasn't even present at the time that Ms. Kaur was killed. So I think there's a problem of causation. And I think Judge Graber asked to assume that there was probable cause to believe that on an accomplice theory of liability, he was involved. But, Your Honor, I think those are two separate issues. Whether or not there's probable cause doesn't mean that there's automatically that he can be deemed to have targeted a civilian, because the probable cause standard is much lower. And this is where I think the standard of review becomes very critical in this case, because Would it be possible, in your view, within the terms of the treaty and the case law so far, to establish any sort of right-line test that would say that harm to a non-involved civilian, either bodily harm or property harm, would not be covered by the political offense exception? Or is that too simplistic, given where we are so far? Maybe, Your Honor, given just the nature of political conflict, it is just too hard. As we see every day in the newspapers, it's very hard to make a right-line test. So if your client robbed a bank to provide funds for a political movement he supported, that would fall, in your view, within the political exception? If the person is alleged to have robbed the bank, Your Honor, you'd have to apply the four factors. And if, during the course of that event, that there were anything that the alleged relator did that would put him outside the scope of the offense, then it stops right there. I think, again, you analyze the actions of Your hypothetical question, your client robs a bank, the purpose is not to fill his own pockets, but to provide funds for a political cause he supports. Would that fall within the exception? And, Your Honor, I'm sorry. There's no evidence that there was any civilian's harm? And secondly, there was That's my next one. Okay. Yes, I think, Your Honor, given those facts Pure bank robbery, money for the political cause, that's okay. Can't extradite. And assuming maybe that the money, there's no evidence that money is used to target civilians, then yes, Your Honor. Let me ask you something about that for the definition of political offense. That is, the language of the treaty is crime is of a political character. And the way I read it is ordinary English. The political character there has to adhere in the crime. It doesn't speak to the motive for the crime. And then when I analogize it to other kinds of crimes, it would also be much narrower than the Quinn definition that you contend for, basically. I'm thinking, take an analogy to narcotics offense. Suppose a person holds up a convenience store. His purpose is to get money in order to buy narcotics. I don't think anyone would call his robbery of the convenience store a narcotics offense. And by analogy, I don't see why, if the purpose in Judge Hawkins' hypothetical was to get money for the revolution or the separation of Khalistan, that the robbery of the bank would be a political offense. Because in both cases, you're talking about the criminal's purpose or motivation rather than the character of the offense, which is the language of the treaty. Help me on this. Yes, Your Honor, I don't think the motive can be. First, I'd like to say I don't think we have to dwell and do a Quinn and Ian debate in this case. I think that we're really talking about the American incidence test in its purest form. And, Your Honor, yes, the motive of the relator could be a factor, but you don't have to establish a motive. And we're not really looking at his alleged motive in this case. We're just looking at the four factors. Hold on. You're not responding to my hypothetical, I don't think. When the person holds up the convenience store in order to get money with which to buy narcotics, is it a narcotics offense? Well, Your Honor, I don't know. But I can say this, that in the context of the political offense exception, we have two types of offenses. We have a pure political offense and a relative political offense. And a relative political offense is something that is a common law crime but is deemed to have a negative effect on the person. A nexus to the political uprising. Well, the whole thing that we have to do is figure out just what makes something that's not a pure political offense nevertheless a relative political offense. The implication of my question is that relative political offense has to have kind of a nos catura sociais relationship to such purely political crimes as treason, espionage, and sedition. And the implication of your answer seems to be they don't have to have any relationship. It can be any kind of crime as long as the purpose is to advance the political goal. No, Your Honor. No. It can't be any type of crime. You have to, again, look at all of the factors and you have to see what the alleged actions were of the person in question. And things can happen during the course of an otherwise political offense. Apply to this crime. If you look what happened is somebody went into a room and shot a woman who was not a government official, who was not in any way her death wouldn't in any way hinder the government or help the government in the political process. So if you just look at the crime itself, it doesn't really get you anywhere. What makes it incidental to any of you to an uprising? I think, Your Honor, again, you look at the offense. You look at the entire offense. Here we are in the room. Okay. And there's the woman. She's not in. And somebody, one of your clients, I realize you've got a question of whether this can be attributed. But assume it was your client. He's sitting there, pulls the trigger, and she's dead. I'm sorry. You said I missed it. I realize it wasn't your client. Yes, sir. And there is a question of attribution of liability. But assume it was, in fact, your client, so we can eliminate that question. Okay. So there he is, woman, not a government official, not in any way involved in the uprising. She's just a civilian. He pulls the trigger. She's dead. What is it about that crime that makes it incidental to an uprising? It is not, Your Honor, unless there were other facts that we could advance that would support it because Where did these facts come from? Again, Your Honor, I don't think what we have to examine is the offense in general. Bring in those facts. Okay. I mean, what are these facts in your case that take what looks on the face of it like a common law murder? What are the facts that turn it into a political offense? Bring them in one by one. Let's look at them. And I think, Your Honor, again, what we have here No, tell me facts. Okay, just bring fact one. What is the fact that turns this common law crime into political offense? The first fact is that alleged members of the Khalistan Commando Force went to the home of government insurgents, government counterinsurgents, in the midst of this political offense, and the government counterinsurgents were guilty of murders and harassing the populace and supporters of the Khalistan movement. So that is our first fact. The second fact is that the alleged actions of Mr. Burpin do not evidence that he was targeting civilians, that his alleged actions seem to advance only this political goal or purpose in this case because the parents were spared. There wasn't an allegation that they were targeting civilians or the entire household. The next fact that, again, further advances that this was political is that when the question is put to the parents of the whereabouts of the other family members, no one asked about Kulwant Corps. The only question was asked is, where is Karamjit Singh, I believe is his name. And then the other militants went to the other part of the home, the parents remained with the relator unharmed, and then it was later learned that both the government counterinsurgent and his wife died. Now, Your Honor, I think there is nothing in this case that would allow us to find that Mr. Burpin had a nonpolitical motive. Nothing. Let me ask you about another crime just quickly. FIR 100, that's the murder of Singh, attempted murder of Ram. Do you agree with the district court that you do not contest the magistrate's determination that these crimes don't fall within the political acceptance? Thank you, Your Honor, very much. I should have made that point earlier. If we were arguing about that a person can target civilians, we would argue that FIR 100 was also political as well, but we are not. Okay. So that one is clearly not a political offense, and I gather your argument on that is strictly probable cause. Strictly probable cause that there are two alleged witnesses. Both those witnesses provide affidavits stating that they did not identify Mr. Burpin as a perpetrator and that given the context of this case, you cannot find the Indian government's evidence reliable. May I ask a similar question with respect to 34? And that is, as I understand it, the expedition judge said that there was no evidence explaining sort of the circumstances or the motive of that attack. Is there, I mean, and what is there about that attack that makes it part of the political movement? Yes. Yes, Your Honor. Again, I think we look at the four on your list of factors. I'm saying I'm starting with the first one, the character of it. And I'm not quite, I mean, if I understand it, the magistrate judge basically said, well, there's just no evidence explaining this. Your Honor, again, the character of the foray is that alleged Sikh militants attacked government officials and their escorts for police personnel, but they were called gunmen in this case. And then the Department of State reports and the experts who testify in the case all evidence that these types of foray were typical of the political uprising in the Punjab during those years. And then the second fact, the second factor, you look at the mode of attack, the mode of attack was also typical, which was an ambush. The third factor we have is the nature of the victims. And as the district court found below, and this court found in the three-judge panel, that the nature of the victims would tend to support that this was a political offense. And then the only property taken during this case, and also, Your Honor, with regard to even case 89, the only property taken in both of those cases was ammunition. Nothing, there's no evidence that there was a robbery, like in Ornelas, where then you negative, you can negative the political application, the political offense exception. So for poor Mrs. Power, he cannot be extradited, even though she was an unfortunate side victim of the home invasion? Collateral damage? Your Honor. His motive was political, but she got in the way. Your Honor, she did not, there's no evidence that Mr. Burpin ever thought that she got in the way. But counsel, assuming that India, and I don't know this, has principles of accomplice liability similar to the felony murder rule that applies in this jurisdiction, he would clearly be liable for any deaths that resulted if he invaded the home with the intent to kill anybody inside the building. Yes, Your Honor. And that intent would transfer to an innocent victim who might not even have been the intended victim of the attack. Absolutely, Your Honor. And that's why we do have a problem with our probable cause argument on that issue, and I understand that. But I think when you look at it, the non-probable cause, I think you have a problem with the political offense exception as well. Well, Your Honor, as to her, if any of Mr. Burpin's actions were deemed to be outside the scope of the political offense, we have to look at his alleged actions. And, Your Honor, just like Benjamin Franklin stated, one of our founding fathers and a political revolutionary himself, that there never was a good war or a bad peace. And this political offense exception, unfortunately, presumes that there is going to be an uncomfortable or unsettling context. But that is the law. There are other treaties out there that we have entered into that have gutted the political offense exception completely. And those are, this Court knows, this Court decided to submit, and they saw that, where they created the political offense exception and instilled in it a political asylum. And maybe that's the more progressive or the better way to do it. But unfortunately, in this treaty, they have not done that. There are other treaties that the Court can look at also with Germany or Spain, I believe, that we've entered, that limit the political offense exception. This treaty does not limit it. And so when the foreign policy decision was made by Congress and the Indian government to have a political offense exception, not have a refugee defense, and Congress and India know full well this is the United States and we have the American incidence test. Okay. Thank you, Counselor. You've just about used your time. We'll give you a minute on rebuttal if you really want to use it. Thank you. Thank you. Good morning, Your Honor. Stan Boone on behalf of the United States of America, representing the Government of India. I think this Court is fully aware of the nature of the proceedings involving extradition. Extradition proceedings are limited in their scope. We look at the treaty. We look at the treaty entered into between the United States, in this case, and India.  It exists for the crimes that have been alleged to have committed. We do not look at the ultimate issue of guilt or innocence with regard to the case. It is a limited application. It is a limited scope. The intent behind such rationale is that this is an issue of dealing with foreign affairs, with relationships between two governments. This is not some sort of rubber-stamp system where we just accept what the Indian government says. There is judicial review of this, but that judicial review is limited. Mr. Berrapin wants to have a full-blown hearing with regard to the allegations of guilt and innocence, and I'm only talking with regard to probable cause at this point in time. And that is not the nature and scope of extradition proceedings. When we look at the case here, this case was quite extensive in terms of the nature and the scope that the district court got into in this case. Now, the district court could have looked at the four corners of the extradition request, and based upon that, I think there is support found within this circuit and other circuits that that would have been a justifiable review by the district court. However, in this case, the district court went a step further. The district court did allow any evidence with regard to Mr. Berrapin's allegations of fabrication, with regard to torture, and with regard to contradictory statements. The district court then carefully considered each of the cases, and in three of the cases found that there was no probable cause that existed. Now, I know that at the lower court and as well as at this court, there was statements that the government did not refute those type of or did not challenge those findings. And I think as this court knows, that the government has no vehicle by which to challenge the findings of the district court. We do not have the ability to directly appeal the district court at the extradition stage. We do not have the ability to file a writ of habeas corpus to challenge the district court's findings. So for purposes of the court of appeals, we are accepting as true those allegations, but we do not contend that they are, in fact, accurate statements. So I need to make that perfectly clear to this court, that I must accept that there was no probable cause with regard to three. We disagree with that. But you could have cross-appealed, right? No, I could not have. Are you sure? With regard to the habeas? Yeah. Well, once the issue is put in play, you can always cross-appeal. I don't think there would have been. I'm not sure where that gets you in this argument, because you're getting sidetracked on other issues. Right. I'm not sure that, in this context, it would have mattered in terms of what we would have gotten out of the ultimate end. Right. With regard to that. I think we would have been back to having a hearing on the three remaining counts, or depending upon the political offense. And so that's where I'd like to take you, if I may. And I'd like to ask you the same question that I asked Opposing Counsel. What is your view of the proper test that we should apply to decide whether something is a relative political offense? With regard to the relative political offense, dealing with common crimes, the offender should be directing their actions to the State, to the father. To the State and what McMullen said in a different context. Yes, Your Honor. And that's exactly why I use McMullen as well as Ian as support for my position. The area of the But do we have to overrule Quinn to adopt your position? You do not have to overrule Quinn because the discussion in Quinn was dicta because that issue in Quinn was never pertinent to the case. Because in Quinn, the Court says that this is not an uprising because the crime occurred outside of the country in which the uprising was alleged to have occurred. In that case, it was Ireland and the acts were committed in England. So Quinn never addressed the incidental two aspects. So, no, you do not have to overrule Quinn. I didn't address it. I'm sorry? I didn't address it. That's a little much. Well. They clearly did address it. You just don't think it's binding. But I think it's a little bit of a misstatement to say they didn't address it. There were pages and pages where the opinion addresses that very point. Yes, but that doesn't mean that that is the holding of the case. Now, what difference does it make now that we're in Quinn? We can change Quinn if we need to. So, assuming that Quinn is a holding instead of dicta, why is it wrong? And why is McMullen correct? Assuming that Quinn is the law of this circuit, I would say it is wrong because of the scope of the incidental two test. The incidental two test, with regard to Quinn, looks at the subjective mind of the person who is being extradited. And it is their mode of attack, none of this, all of the Uralis v. Ruiz factors don't apply. They may have done a bad job. They may have robbed the bank in order to get money. It doesn't matter because they believe that it is consistent with their effort to further their uprising, et cetera, in their war rebellion, whatever. And that's the problem with that analysis, is that civilians caught in the crossfire, it may be bad judgment on the part of the rebels, but nevertheless, it is a political offense exception. And therefore, an individual with similar treaties, and we assume that the treaties have similar language, and that's something that Mr. Saccone does point out, that treaties do have different aspects with regard to the political offense exception. But many of the treaties do have this kind of language that exists. In this one with India, Israel, for instance, has similar ones. And that's where kind of the analysis is going. But that is an overly expansive view of the political offense doctrine and should not be accepted by this Court. Then should we go back to the Supreme Court's formulation or should we go beyond it? Well, the Supreme Court answers the questions with regard to the political offense. But what Ian as well as Ahmad look at, they do look at those factors. And what the Court looks at in those cases is it looks at the nature of the civilian aspect. Well, as one, it seems to me the Supreme Court allows for that, for the civilian status of a victim to be taken into account, along with the other three factors. But is there any occasion in this case to expand on that, that is, explicitly to adopt the Ian standard, for example? Or should we just go back to basics? Well, I think in this case, because what we are looking at here, Your Honor, is the three cases that are involved with regard to the political offense exception which don't apply. And what we're focusing really on is the nature of the victim here. There is an argument that the foray as to FIR 89 is a little bit different, is consistent. Well, would your answer be different if, for example, there had been, which there was not in this case, expert or other evidence that targeting of civilians within the requesting State was an object of the political movement? With regard to applying the four factors? Uh-huh. I think that that's where it runs into a problem with the mode of the subjective mode of the realm. I'm just going to put Oh, that's nothing subjective about it. If there had been evidence in this case, which there was not, but if the expert had expressed an opinion or if there was direct evidence of some sort that an object of the political movement was to target civilians, would that make a difference? I would say no. And I would say no because I don't think that the attacks on civilians should ever be recognized as a political offense exception. And courts have seemed to adopt that approach. I mean, there are tragic things that occur in society. Your answer is no because you don't think that's the way it should be? Yes. I don't think You've got to do a little better than that. Well, I I mean, your personal opinion is valuable, but what's your authority for that? If the question is, look, they say the way we're going to win the revolution is we're going to stabilize society by making it difficult for people to go to bus stations, to markets, to do their daily business. And what they do is by blowing up cars in the middle of town and really cause problems for the government by killing civilians. That's the objective. Let's say there was evidence like that. Why isn't that incidental to an uprising? That's the question. And I know your personal view. What's the law? What's the law on this? I appreciate that, Your Honor. It is my authority for that is Ian and Wiggin, which discuss. I'm sorry, Ahmad, which discuss that the killing of civilians not directed, you know, not it's not the state should is not what the nature of political offense is all about. And that's my authority. Why are they wrong about that? Why are they wrong? Why are they not wrong about that? If that's what they in fact hold. Why is that something we should follow? Isn't Quinn exactly right on this point, then, that if we don't second guess the methods of terrorists or freedom fighters or whatever you call them. If they choose a method, we have an uprising. That's the premise, right? You don't disagree. There's an uprising here. So they're involved in a revolution as good as our revolution of 1776, just like any revolution, no better, no worse. And in the pursuit of that revolution, they wreak havoc. They do what they need to do to win the revolution and get rid of the oppressors in their view. Why are we here to second guess their tactics or methods? I think the Court has raised a point with regard to one of the criticisms of the American incidence test, and that is what the American incidence test appears to be a narrow application, not applied to this kind of context. It's ever-evolving. When the political offense exception started, there's always been, since the beginning of mankind, atrocities against civilians. But in the context of the political offense, which came at the last turn of the century, the formulation, it was directed more at bans of armies against the state. You'd have us adopt, what, the Swiss test? Is that your preference? Well, I would have you adopt the ‑‑ I hear a lot of terms, and I see what you mean by the Swiss test. Which would mean that attacks against civilians, I take it, would be out of the picture as far as being a political offense. Yes, I do agree with that. And I think that we, as a court of law here in the United States, should not be this progressive approach that, well, now that didn't work, these organized bans, now we are going to expand our definition. Okay, so how do you draw the line then? Okay, so they now target a government facility, and bam, you know, people get killed as a result of that. You know, they're mostly, what they're trying to do is disrupt the trains, let's say. I don't know if the trains are run by the government in India, but let's assume some government operation that mostly involves government officials, but in conductor's operation, some civilians get killed. Clearly the operation is pursuing a political objective. No doubt about that. Right. So does the fact, anything ‑‑ where do you draw the line in that? Again, I think that I draw the line that the killing of civilians should not be a political offense. Oh, there's a terrible series of events going on in the Sudan where the Janjawe are systematically destroying villages, raping women, killing men, aimed apparently at eliminating entirely the African population, the non‑Arab African population of the Sudan. If the people or the victims of this decided that they wanted to use those very same tactics to put a stop, they wanted to attack the villages of the Janjawe, rape their women, burn down their villages, kill their men, would we explore that? Would we say, no, those are not legitimate means? Not legitimate what? Would we look to the legitimacy? Would we make a judgment about the legitimacy of the means they employed to stop the genocide deployed against them? I think that it is difficult because of ‑‑ I think that the political offense should be an issue for the courts to look at in the context of actions directed against the state. I realize that how do you define the state in that context of Sudan? Who is in charge? Who is the state or is this a civil war? Well, since the government of Sudan is supplying the helicopters that provide cover for the Janjawe, I think we can probably assume that they're involved. Okay. At least that's what the Secretary of State tells us. With regard to that, do I think that the raping and killing of civilians ‑‑ They directed the same actions back against the Janjawe, and we were faced with an extradition arising out of that and the application of this treaty. Would we inquire into the legitimacy of the means employed by the victims of the genocide? I don't think we should be. I don't think that that is the ‑‑ Is that what you're arguing? No, I don't think ‑‑ what I'm arguing is that the actions, that the common crimes should be directed at state officials, the state. Counsel, let's say that, taking Judge Hawkins' hypothetical, the common crimes are directed at civilians who are part of the Arab population by the non-Arab population trying to protect themselves from genocide by making their area too hard for the government to control. Let's just say that hypothetically. And let's say that we accept your interpretation so that these do not fall within the political offense exception. They're extraditable as far as the political offense exception goes. I have two questions about whether such rebels against government genocide could get protection. One question is, could the Secretary decide not to honor the extradition request from the Sudan? And the second question is, could the rebel against the government genocide obtain asylum in the United States, even though he did not fall within the political offense exception? To answer your first part of the question, yes, the Secretary of State could not extradite. When you say could not extradite, you mean could decide not to? Could decide not to extradite that individual, yes. That is within the prerogative of the Secretary of State as to whether or not they wish to abide by the terms of the treaty. Second, with regard to the asylum application, that is a different area. That is a much more expansive area. Now, my area is not necessarily in the asylum context, so I cannot speak specifically. But from my brief understanding of the asylum process is that that would be something that could be considered by the court with regard specifically with the Sudan, with the genocide, the Muslims, and the Christians, in terms of the rebel was being because of a religious or an ethical orientation with regard to that. And then that would be the subject of an asylum. But as to whether or not asylum would be granted, I can't specifically answer that because I don't know. It would have a well-founded fear of persecution on account of his. Yes, I think there would be something there. Yes, yes. Mr. Boone, you know, you managed not to answer Judge Rawlinson's question. And I would like to hear your answer to her question. And you've probably forgotten what the question was because you've had a lot of questions. But the question, and if I'm mishearing Judge Rawlinson, correct me, what Judge Rawlinson asks is do we have to overrule Quinn in this case in order to rule in your favor on behalf of the government? And you took the question to be a question about whether Quinn is binding. Judge Graber pointed out that it's not binding on unbanned courts. It doesn't matter anyway. What I thought Judge Rawlinson asked, and I would like to hear the answer to that. I think this is the question. If we choose to follow Quinn, either because it's binding or it's a matter of discretion, so let's say we look at Quinn, we find it persuasive, and we say this is better law than Ian and some of the other cases you're citing, do you then lose or is there some way you could succeed or you could prevail even if we bind to Quinn? Is that the fair statement? That's a fair statement. And I would really like to hear an answer to that. Your Honor, assuming that you adopt the rationale of Quinn, no. We do not lose in this case. And the reason we do not lose in this case is there has been absolutely no evidence proffered by Mr. Berrapin with regard to why he committed these crimes. The evidence that is presented is general information about encounter killings, general information that individuals go into the home. I'm sorry. That's not general information. That is specific information that they went into the home to deal with counterinsurgents. Now, but that Ms. Kaur was incidental. I mean, she's almost incidental to the incidental to aspect. She, there is nothing to suggest what the motivation, why that was done to give that subjective approach as to why the rebel. It was done in the same operation by the same people. The primary targets were political. That's established for the purposes of this affair. Yes, Your Honor. And during the course of that, somebody gets killed. Best we can tell it was to keep her from identifying the perpetrators. So, you know, so they wouldn't be caught by the police or, you know, they wouldn't be able to be fingered. Why isn't that, I mean, under this expansive rule of Quinn, and again, we're now buying into Quinn. Yes, Your Honor. Why isn't that incidental? They go in. They do this operation. They find somebody who could be a witness and if allowed to live would finger them and disrupt their organization. And so they decide to complete the job. We'll have to do her in. We don't have no animus towards her. We don't really hate her or anything. I understand. This is just completing the job, you know, getting the job done. Why wouldn't this be the most fair application of Quinn? First of all, Your Honor, that the courts proffer as to what you think that they did it to kill the witness so the witness wouldn't identify. There were two other witnesses that were allowed to live. So Mr. Berrapin has the preponderance of the evidence. These two people were allowed to live. So that isn't consistent with an identification aspect. Second is does the political offense apply to the overall conduct for this particular course of offense or do we need to look at it with regard to the individual who is harmed? The crime, the murder, because he has only been ordered extradited for that one murder. And the rule of speciality says he can only be charged with that one murder upon his return to India. And I think you need to look at that individual charge to see whether or not that is the case. And I think the court's question to me is very probative because you can't say that that preponderates that the reason she was killed was because of identification, because of two other individuals being left there. Now, that may be the case. For the fine point, you view this as a question of fact, the question of whether the killing of the wife is incidental to you view is a question of fact, and that is a question of way the evidence presented at the hearing, and the magistrate said it's not, he hasn't shown it's connected enough to the crime. So under that reading of Quinn, Quinn would stand and would just, if we were to do him any favor, would do him any favor on the facts. Is that correct? Yes, Your Honor. Yes, that's correct. Let me ask you one factual question as well. What's your view of FIR 100 and FIR 34? Do those independently standing on their own justify extradition? From the context of a probable cause or from the context of a political question? If we were to agree with the district court's conclusion with regard to FIR 100, for example, is that standing alone enough to justify extradition? Yes. And the same thing with 34? Yes. And if that were the case on 100, we don't even reach the political question doctrine, right? Yes, if we were to say the district court was right on FIR 100, there's no reason to even get in. The petitioner conceded 100, right? That's correct, yes. We do not need to get in. Except if we allow extradition on 100, I think I understand the law to be that the government in India cannot question him on anything but 100. That's correct. My question was narrower. That is correct. Let me ask you, as now no longer the political issue but rather a probable cause, the district judge treated the later affidavits as recantations, and he regarded recantation evidence with some suspicion. I'm not sure they in fact are recantations because the later affidavits in every case, they say, that's a false affidavit. They made me sign a blank piece of paper. They inserted the name, the identification name afterwards. Do you think that the later affidavits are in fact recantations? It depends at what level you want to analyze a recantation. In other words, if the extradition request had this individual's statements with regard to this is what I did and then he subsequently said that would be your classic example of recantation. I said it before, but I didn't tell you the truth at first. Right. The mix here is with regard to the fact that the police officer says this is the information found in the files, they are true and accurate, and that's what this individual said. And I think that one of the problems with this whole evidentiary issue that we got into was that the relator then brings in this evidence to the government. It brings it in shortly before the extradition trial and says, well, here's the evidence with regard to the recantation or the contradictory or fabricated evidence. The government then is at a disadvantage at that point to say, the only way to really do that is to bring in all of the participants to the proceeding. Well, but this is not ratio to contra. The government is at a disadvantage now. But if it decides because this evidence is not sufficient, they go back and do it. I mean, there's nothing to prevent that. No. But where I'm going with this is if the district judge was wrong in characterizing the later affidavits as recantations, and if that affected the district judge's treatment of that later evidence, are we bound to give the same degree of deference to the decision of the district court in saying the probable cause had been established? Because I don't think this is recantation in the ordinary sense. It's contradictory, and it says those earlier affidavits, those are simply false. I never said that. You put that in. The district courts did discuss contradictory. It says that that's ultimately an issue that needs to be decided at the district court said recantation contradictory, kind of categorized it in recantation contradictory context. And I think that in that situation, with the nature of extradition proceedings, where we have a request from the sovereign saying these are the facts upon which we base it upon, that then then the relator brings in or Mr. Berrapin brings in information that contradicts that or allegedly recants the hearsay statement. I mean, that's a little bit of the problem there. Well, you're not contradicting a hearsay statement. For example, on number 34, it's Mr. Nirmal Singh who says I never did that. They put it in. It's not hearsay. It's a lie. Right. What the district court also discussed with regard to those aspects, because the district court found probable cause with regard to eight of the offenses. And what the district court said is we don't know the biases. We don't know how these individuals were approached. We don't know if they were in fear of their life. We don't know those questions. You know, I can get up here and say that they were, but I don't know that. I don't know the requirements of how that is or whether they have a motive against the government now or what's going on. But that's something the credibility determination is something that the trial court, the trier of fact, determines whether or not to accept. Although this is all on the papers, it's not as though he's had these witnesses in front of him. I agree. And extradition has never required that the sovereign bring in somebody, their witnesses. But when I'm saying this, I'm asking the question of a deference. That is to say the district judge may be in no better position than we are to judge credibility. That is to say he read papers. We're reading papers. Yes, but then that is an adoption of a de novo review. Then there's no reason to have the district court make these, to look at this information. If that's it, then you're going to be adopting a de novo review that we say that's not that. And we would weigh it differently. And I think that when looking at the district court's decision, I think the district court carefully considered the evidence. It may not necessarily agree with that consideration or that weight that you had given. But this court has to give the district court that due deference with regard to the fine. I mean, in this case. And we made a decision separate from the question of whether there's a political issue. There's no nexus at all between them. We would review the problem of cause determination in a case. Let's say there's a civil common law crime with no political connection at all. We'd review it exactly the same way in a case like this with the charge of politics. And the very issue that they're claiming is the reason you ought to not trust the government's case and the reason you ought to not be skeptical of the government is that this is just another form of the battle over which we're fighting back home in the revolution. There's no connection between the two? We'd review them exactly the same way? I see my time is up. May I answer? You may answer the question. What the relator, Mr. Berpin, has attempted to do is try to make a connection between the fabrication and the political offense. He's tried to mix those concepts together with regard to this is the kind of nature of this. It's part and parcel part of the political offense. It's because what the Indian government does is they then trump up these charges. So it does mix in. We don't contend that that should be the analysis. The analysis should be look at the request. Is there probable cause that exists there? This standard that has been given is no different. I mean, it is greater. It's not as great as a preliminary examination in the federal context, but in the context of a criminal complaint which is based upon probable cause, that's an agent that goes before a judge relied upon hearsay. Thank you. Thank you. Your Honors, Mr. Boone highlights really one of the problems and one of the tragedies of this case for Mr. Berpin is that he can be extradited based on one offense. And I think this Court is well aware of the history of this case and Mr. Berpin's qualification, near qualification as a refugee. So by eliminating the political offense in the manner that I believe the government is arguing, you would be gutting it of its purpose. But if it doesn't apply to one charge, by what authority can we prevent Mr. Berpin from being certified for extradition? Yes, Your Honor. Although we argued in our briefs, I don't think that we have a strong argument on that issue. So I will concede that. But our position is the government is asking for an American incidence test that's way beyond Ian. Ian, leaving aside his colorful language. It doesn't need any test on charge 100, does it? No. We're not raising the political offense exception, Your Honor, to charge 100. Ian, it goes way beyond Ian, the government's argument in this case, because Ian was concerned about the targeting, express targeting of civilians, not the death of a civilian during the course of a political offense. And if one was to examine Ian, you would note that one of the cases they cite with approval is Ramos-Diaz, which really involved a very egregious conduct, or apparently egregious conduct, on behalf of the alleged perpetrators. And they said that was an appropriate application of the political offense exception. Thank you, counsel. Your time has expired. The case is argued and submitted for decision. And that concludes the court's calendar for discussion. The court stands adjourned.
judges: Schroeder, Kozinski, Rymer, Kleinfeld, Hawkins, Thomas, Graber, W. Fletcher, Tallman, Rawlinson, Callahan